744 A.2d 9

James SESSOMS

v.

STATE of Maryland.

No. 68, Sept. Term, 1999.

Court of Appeals of Maryland.

Jan. 11, 2000.

Daniel H. Weiss, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

CATHELL, Judge.

On April 16–21, 1998, petitioner, James Sessoms, was tried before a jury in the Circuit Court for Baltimore City on a seven-count indictment alleging rape, assault, assault with intent to rape, and sexual offenses. At the close of the State's case, the trial court granted defense counsel's motion for judgment of acquittal as to the charge of assault with intent to rape, but denied it as to the remaining charges. The jury convicted petitioner of a third-degree sexual offense, acquitted him of the remaining charges, and the court imposed a ten-year sentence. Petitioner appealed to the Court of Special Appeals, which affirmed his conviction in an unreported deci-

sion. He presents two questions, for which we have granted a writ of certiorari:

1. Does the test for admitting other crimes evidence enunciated in [*State v. Faulkner*], 314 Md. 630, 552 A.2d 896 (1989), apply when such evidence is not offered against the defendant, but in order to establish a defense?

2. Is a missing witness inference, the basis of which is speculation, properly argued to the jury when no missing witness instruction is generated by the evidence?

## I. Facts

The facts in this case are somewhat convoluted. Tracy Dillon testified that at approximately 7:30 p.m. on December 24, 1996, she was walking through an alley en route to a store to purchase a lottery ticket. She emerged from the alley on Baltimore Street where she encountered a man she later identified as petitioner, who attacked her from behind, dragged her into an alley, and raped her twice at knife point. Her assailant then released her and she ran home. Before reaching her house, Tracy Dillon saw her brother, Kelly Dillon and a companion, Antonio Shields, on the corner of Lexington and Amity Streets.

Kelly Dillon testified that when he observed his sister approach he noticed that she was crying and dirty, with leaves in her hair and blood on her hands. After Tracy Dillon told her brother what had happened, she, Kelly Dillon, and Antonio Shields began searching the neighborhood for the perpetrator. Upon locating petitioner on the corner of Fayette and Schroeder Streets, the three of them confronted him. Petitioner allegedly stated, "I didn't do nothing to her," to which Kelly Dillon responded, "[W]e didn't said you did." Tracy Dillon smelled petitioner to confirm that his cologne was the same as her attacker's. Kelly Dillon noticed dirt and debris on petitioner's clothes and then compared the aromas of Tracy Dillon and petitioner. Determining that the scents matched, Kelly Dillon and Antonio Shields then severely beat petitioner into a state of semi-consciousness.

Officer Edward Marshall testified that when he responded to the complaint he found a hysterical Tracy Dillon standing about fifteen feet from petitioner, who was now laying unconscious in the street. By the time he arrived on the scene, Kelly Dillon and Antonio Shields had already fled, apparently because Kelly Dillon believed there was a warrant out for his arrest. Tracy Dillon remained and informed Officer Marshall that petitioner had raped her and that petitioner had just been assaulted by two unknown men. The officers accompanied Tracy Dillon to the scene of the alleged rape and recovered her scarf and money; however, a search conducted to find the knife was unsuccessful. Tracy Dillon was then transported to Mercy Hospital.

Nurse Sharon Will, who was received as an expert in sexual assault forensic examination, testified that she examined Tracy Dillon at Mercy Hospital. She informed the trial court that Tracy Dillon's coat had debris on it, her shirt and pants were stained, her pants soiled and her underwear was stained with blood. A sexual examination was performed and although no semen was found, the exam revealed abrasions on Tracy Dillon's neck and left elbow, and lacerations in her anal-genital region, which Nurse Will stated were consistent with non-consensual sex. Additionally, Tracy Dillon admitted to Nurse Will that she knew who had attacked petitioner, but refused to reveal their names.

At the close of the State's case, defense counsel moved for judgment of acquittal on all counts of the indictment. The trial court granted defense counsel's motion for judgment of acquittal as to the charge of assault with intent to rape, but denied it as to the remaining charges.

Testifying on his own behalf, petitioner denied touching Tracy Dillon in any way. He told the jury that on the evening of December 24, 1996, he was walking down Baltimore Street to purchase two lottery tickets, cigarettes, and vodka. He was approached by two men, one of whom claimed that petitioner had robbed his sister of $40.00. After petitioner denied it, the two men attacked him, beating him until he was unconscious.

Petitioner's next memory was of regaining consciousness in University Hospital on December 25, 1996, with his girlfriend, Paulette Alderman, waiting by his hospital bed. Petitioner claims that while she was visiting, he was permitted by police to retrieve several items from the pants he had been wearing the night he was attacked. He planned to give her the contents of the pockets for safekeeping. During this inspection, petitioner noticed that two $5.00 bills and two lottery tickets, which he had in his possession prior to his being attacked, were missing.

Immediately preceding opening statements, the State raised a motion *in limine* to exclude evidence of an allegation that Kelly Dillon had robbed Tyrone Pitman early in the morning of December 25, 1996, just a few hours after the alleged attack on his sister, Tracy Dillon, and the beating of petitioner, and in the same general vicinity. Defense counsel argued at the hearing on the motion that Tracy Dillon had fabricated the rape charges to cover up the fact that her brother had robbed and beaten petitioner. In support of this theory of the case, defense counsel wanted to introduce evidence that when Officer Francis Shipp was driving Tracy Dillon home at approximately 2:45 a.m. on December 25, 1996, Tracy Dillon saw and identified Kelly Dillon as her brother to the officer. Just moments later, Tyrone Pitman ran up to the police car and informed Officer Shipp that he had just been robbed by "that man," referring to Kelly Dillon.[1] Upon hearing Mr. Pitman's accusation, Tracy Dillon responded, "I ain't saying it is my brother or isn't my brother." Petitioner contends that evidence that Mr. Pitman was robbed by Kelly Dillon within hours of Tracy Dillon's rape and petitioner's beating was relevant, particularly when coupled with Tracy Dillon's incon-

---

1. In the Court of Special Appeals' unreported opinion in this case, the Court misconstrued the record by erroneously stating that it was the petitioner who approached the police cruiser and said that he had been robbed by Kelly Dillon. This is incorrect. By the time Officer Shipp took Tracy Dillon home, petitioner was unconscious in the hospital. It was Tyrone Pitman who allegedly approached the vehicle and made the accusation against Kelly Dillon and it was in response to his comment that Tracy Dillon recanted her statement.

sistent statements concerning her brother's identity, and petitioner's claim of a robbery and his missing money and lottery tickets. This information was all related to petitioner's defense that he was a victim of a robbery at the hands of Kelly Dillon and that Tracy Dillon had falsely accused him of rape to cover for her brother's involvement in the robbery and assault on petitioner and the robbery of Pitman.

The trial judge ruled to exclude the evidence of the Pitman robbery based on the following rationale:

> But I'm not going to allow the very, very prejudicial testimony of some stranger running up to the car saying, that guy robbed me, and the stranger saying, and that guy was the victim's brother, I'm not going to allow that. . . .
>
> . . . .
>
> . . . [A]s I understand the rules of evidence, I must decide whether that information is more prejudicial than probative. As I would have to make that decision, if this were an allegation of robbery, and if I allow other past allegations of robbery, because if the jury hears that, the jury presumes that he's a robber. Pattern of robbery. I don't think that this is any less prejudicial, the particular point that somebody ran up to the car and said, that guy just robbed me or tried to rob me. Okay. I think its more prejudicial than probative.

As a result, defense counsel was permitted to ask Tracy Dillon only about her initial identification of her brother to Officer Shipp and her subsequent recanting statement, "I ain't saying it is my brother or isn't my brother"; however, defense counsel was precluded from eliciting the context in which these inconsistent statements were made, i.e., in response to Mr. Pitman's complaint that he had just been robbed by Kelly Dillon.

During closing arguments, the State argued, over objection, that petitioner's claim that he was robbed was uncorroborated and untrue. Defense counsel never called petitioner's girl-friend, Paulette Alderman, to testify and the court allowed the State to argue that she was a missing witness and to argue an

inference that, because she did not testify, her testimony would have been detrimental to petitioner's case.

The jury convicted petitioner of a third-degree sexual offense and acquitted him of the remaining charges. The court imposed a ten-year sentence immediately following the verdict. Petitioner appealed to the Court of Special Appeals on three issues: (1) whether the trial court erred in excluding evidence of other crimes of a witness; (2) whether the trial court erred in permitting the State to make certain remarks during closing argument; and (3) whether petitioner's conviction was barred by the principles of double jeopardy. The Court of Special Appeals found no error and affirmed the judgments of the circuit court. As we have indicated, we granted a writ of certiorari.

We hold that the test for admitting other crimes evidence in criminal proceedings enunciated by *Faulkner*[2] does not apply to crimes, wrongs, or acts committed by anyone other than the defendant. The other crimes evidence rule is a court-created standard designed to ensure that a defendant is tried for the crime for which he or she is on trial and to prevent a conviction based on reputation or propensity to commit crimes, rather than the facts of the present case. Because this rule is premised upon protecting an accused from undue prejudice, it does not apply to exclude acts committed by other people, such as an act committed by a witness who later testifies in the criminal proceedings. Because we answer petitioner's first question in the negative and accordingly

---

**2.** *Faulkner* created a three-part test that a trial judge must apply before admitting other crimes evidence: (1) "determine whether the evidence is *prima facie* admissible because it fits within any exception to the presumptive rule of exclusion," *Conyers v. State*, 345 Md. 525, 550, 693 A.2d 781, 793 (1997) (citing *Faulkner*, 314 Md. at 634, 552 A.2d at 898); (2) determine "whether the accused's involvement in the other crimes is established by clear and convincing evidence," *Faulkner*, 314 Md. at 634, 552 A.2d at 898; and (3) "[t]he necessity for and probative value of the other crimes evidence is to be carefully weighed against any undue prejudice likely to result from its admission." *Id.* at 635, 552 A.2d at 898.

vacate the erroneous decision of the trial court, it is unnecessary for us to address petitioner's remaining question.[3]

## II.   Other Crimes Evidence

The Supreme Court of the United States' decision in *Boyd v. United States,* 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077 (1892), established the legal standard known as the other crimes evidence rule.   In that case, the Supreme Court recognized the harm that the introduction of evidence can have against defendants in a criminal trial:

> [Evidence of other crimes] were collateral to the issue to be tried....   Proof of them only tended to prejudice the defendants with the jurors, to draw their minds away from the real issue, and to produce the impression that they were wretches whose lives were of no value to the community, and who were not entitled to the full benefit of the rules prescribed by law for the trial of human beings charged with crime involving the punishment of death....   [W]e are constrained to hold that ... those rules were not observed at the trial below.   However depraved in character, and however full of crime their past lives may have been, the defendants were entitled to be tried upon competent evidence, and only for the offense charged.

*Id.* at 457–58, 12 S.Ct. at 295, 35 L.Ed. 1077.   The rationale behind such a rule is self-explanatory.   As one judge has said:

> If I know a man has broken into my house and stolen my goods, I am for that reason more ready to believe him guilty of breaking into my neighbor's house and committing the same crime there.   We do not trust our property with a notorious thief.   We cannot help suspecting a man of evil life and infamous character sooner than one who is known to be free from every taint of dishonesty or crime.   We

---

**3.**  We have recently clarified our position on the use of missing witness instructions in *Patterson v. State,* 356 Md. 677, 741 A.2d 1119 (1999), holding that a trial judge need not give a missing witness instruction. When appropriate, a missing witness inference may be argued to the jury.

naturally recoil with fear and loathing from a known murderer, and watch his conduct as we would the motions of a beast of prey. . . . This is human nature—the teaching of human experience.

*State v. Lapage,* 57 N.H. 245, 300 (1876) (Ladd, J., concurring).

Prior to these holdings and others, evidence of other crimes, wrongs, or acts was allowed into courtroom proceedings apparently without limitation. Courts began excluding such evidence based on three principles: (1) the strong tendency to find the accused guilty of the charge merely because of his or her history of committing such acts; (2) the tendency to condemn the accused not because of guilt, but because he or she escaped punishment from previous offenses; and (3) the injustice of unfair surprise. *See* 1A John Henry Wigmore, *Evidence* § 58.2, at 1215 (Tillers rev.1983). None of these policies pertain to parties other than the defendant.

## A. Maryland Caselaw

This Court has had many opportunities to interpret the other crimes evidence rule and has consistently held that, in a criminal proceeding, it is a standard limited to acts committed by a defendant. We have never extended the use of this rule beyond the scope of a criminal defendant and we refuse to do so today. Most recently we said

that this rule means that evidence that *the defendant* committed other crimes or bad acts is not admissible unless it has special relevance. . . .

The rationale underlying the exclusion of other crimes evidence is that a jury, confronted with evidence that *a defendant* committed another crime, may utilize improperly the evidence to conclude that *the defendant* is a "bad person" and, therefore, should be convicted of the charges for which he is on trial.

*Wynn v. State,* 351 Md. 307, 316, 317, 718 A.2d 588, 592, 593 (1998) (emphasis added); *see State v. Taylor,* 347 Md. 363, 368, 369, 701 A.2d 389, 392, 392 (1997) ("Evidence of other

crimes or other bad acts committed *by the accused* is not admissible unless it has special relevance.... Underlying this rule is the concern that the jury will use the other crimes evidence to convict and punish *the defendant* for having a criminal disposition or to infer that he is more likely to have committed the crime for which he is on trial." (emphasis added)); *Conyers v. State,* 345 Md. 525, 560, 693 A.2d 781, 798 (1997) (noting that evidence of other crimes generally is inadmissible because it indicates that the accused probably committed the crime for which he or she is on trial); *Ayers v. State,* 335 Md. 602, 630, 645 A.2d 22, 35 (1994) ("We have frequently enunciated the general rule that evidence of *a defendant's* prior criminal acts may not be introduced to prove guilt of the offense for which *the defendant* is on trial." (emphasis added)); *Faulkner,* 314 Md. at 633, 552 A.2d at 897 ("Generally, 'evidence of *a defendant's* prior criminal acts may not be introduced to prove that he is guilty of the offense for which he is on trial.' Evidence of other crimes may tend to confuse the jurors, predispose them to a belief in *the defendant's* guilt, or prejudice their minds against *the defendant.*" (emphasis added) (citations omitted) (quoting *Straughn v. State,* 297 Md. 329, 333, 465 A.2d 1166, 1168 (1983))); *Straughn,* 297 Md. at 333, 465 A.2d at 1168–69 ("There are two reasons for the rule. First, if a jury considers *a defendant's* prior criminal activity, it may decide to convict and punish him for having a criminal disposition. Second, a jury might infer that because *the defendant* has committed crimes in the past, he is more likely to have committed the crime for which he is being tried." (emphasis added)); *State v. Jones,* 284 Md. 232, 238, 395 A.2d 1182, 1185 (1979) ("As a general rule, it is error to admit evidence of other offenses independent of the particular crime charged. The reason for the rule is obvious; such evidence may merely show bad character, improperly prejudice the jury, or unfairly surprise *the accused* in his defense at trial." (emphasis added) (citations omitted)); *Cross v. State,* 282 Md. 468, 473, 386 A.2d 757, 761 (1978) ("[E]vidence which tends to show that *the accused* committed another crime independent of that for which he is on trial,

even one of the same type, is inadmissible." (emphasis added)); *Ross v. State*, 276 Md. 664, 669, 350 A.2d 680, 684 (1976) ("The frequently enunciated general rule in this state, followed uniformly elsewhere, is that in a prosecution for a particular crime, evidence which in any manner shows or tends to show that *the accused* has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmissible." (emphasis added)), *quoted in McKnight v. State*, 280 Md. 604, 612, 375 A.2d 551, 556 (1977).

Every indication from the Maryland case law is that, in criminal proceedings, the other crimes evidence exclusionary rule is limited to crimes, wrongs, and acts committed by the defendant. This interpretation is bolstered by the intent behind this rule to ensure that an accused gets a fair trial free from undue prejudice and bias based on *his or her* past criminal history. To extend this rule of exclusion to parties other than the defendant broadens it beyond the type of prejudice that this rule was designed to prevent. In the case *sub judice*, evidence of other crimes committed by a witness may serve to impeach that witness's testimony but it does not result in an unfair trial wherein a defendant may be punished for prior behavior. Clearly, this is not the type of prejudice that the other crimes evidence standard was designed to protect.

### B. Maryland Rule 5–404(b)

Title 5 of the Maryland Rules, "Evidence," became effective on July 1, 1994. Maryland Rule 5–404(b) served to codify the other crimes evidence rule expressed in Maryland caselaw and was derived from Federal Rule of Evidence (FRE) 404(b). Maryland Rule 5–404 states:

(a) *Character evidence generally.* (1) In general. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(A) Character of accused. Evidence of a pertinent trait of character of an accused offered by the accused, or by the prosecution to rebut the same;

(B) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(C) Character of witness. Evidence of the character of a witness with regard to credibility, as provided in Rules 5–607, 5–608, and 5–609.

(2) Definitions. For purposes of subsections (a)(1)(A) and (B) of this Rule, "accused" means a defendant in a criminal case and a child alleged to be delinquent in an action in juvenile court, and for purposes of subsection (a)(1)(B), "crime" includes a delinquent act as defined by Code, Courts Article, § 3–801.

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Maryland Rule 5–404(a) distinguishes the use of character evidence based on whether the character at issue is of the accused, the victim, or a witness. The State argues that because Maryland Rule 5–404(a) makes this classification, Rule 5–404(b), which uses the general term "person," indicates that the Court of Appeals and the Rules Committee intended for this rule to apply to persons other than the defendant. We reject this argument.

In *Wynn*, 351 Md. 307, 718 A.2d 588, we had to consider the other crimes evidence standard outlined in Maryland caselaw in congruence with Maryland Rule 5–404(b). In that case we said, "Maryland Rule 5–404(b) . . . excludes from introduction

at trial evidence of other crimes, wrongs, or bad acts to prove the character *of the defendant* in order to show that he or she acted in conformity with that character with regard to the offense with which he or she is charged." *Id.* at 312, 718 A.2d at 590 (emphasis added). To expand the scope of this rule to include persons other than the defendant would turn the purpose of this rule on its head. Evidence of a witness's past bad behavior, when the witness is not the defendant, does not imply that the defendant possesses a propensity to commit crime or a specific type of crime.

■ Because Maryland Rule 5–404(b) is derived from FRE 404(b), an analysis of how the federal courts have handled this issue is helpful. "We have indicated that [where the important language is the same], this Court will find persuasive the decisions of the Federal Courts construing the provisions of the Federal Rule from which the language of the Maryland Rule is taken." *Edmonds v. Lupton*, 253 Md. 93, 99, 252 A.2d 71, 74 (1969); *see Elmer v. State*, 353 Md. 1, 11, 724 A.2d 625, 629 (1999) (noting that when a federal evidence rule contains the same language as a Maryland evidence rule, the Court may look to the former when interpreting the latter) (citing *Jackson v. State*, 340 Md. 705, 716, 668 A.2d 8, 13–14 (1995)); *Metropolitan Mortgage Fund, Inc. v. Basiliko*, 288 Md. 25, 27, 415 A.2d 582, 583 (1980) (same). "The courts of this State, however, are not bound by the holdings of a federal district court or of a federal circuit court of appeals." *Gayety Books, Inc. v. Mayor of Baltimore*, 279 Md. 206, 213, 369 A.2d 581, 585 (1977).

Looking to the federal courts, we have found that our interpretation of Maryland Rule 5–404(b) is supported by a majority of federal court interpretations of FRE 404(b) on this issue. As the United States Court of Appeals for the Second Circuit has said:

[W]e believe the standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword. The prosecution, in the Anglo–American tradition,

may not ordinarily offer evidence of a defendant's prior wrongdoing for the purpose of persuading the jury that the defendant has a propensity for crime and is therefore likely to have committed the offense for which he stands trial. 1A Wigmore, *Evidence* § 58.2 (Tillers rev.1983). As Dean Wigmore points out, the evidence "is objectionable not because it has no appreciable probative value but because it has too much." *Id.* at 1212. Presumably, the "too much" argument means that a guilty person, and, of far more serious concern, an innocent person, may be convicted primarily because of the jury's willingness to assume his present guilt from his prior misdeed. Wigmore also identifies objections based on the risk that the jury will convict because the defendant may not have been punished for his prior offenses and the injustice of requiring the defendant to defend against a series of accusations. *Id.* at 1215. These possibilities of prejudice must be assessed even in cases where the prosecutor offers similar acts evidence, not to prove the character of the accused, but to prove one of the permissible subsidiary facts listed in Rule 404(b), such as intent or plan, *United States v. Figueroa,* 618 F.2d 934, 943 (2d Cir.1980). However, risks of prejudice are normally absent when the defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense. *See People v. Flowers,* 644 P.2d 916 (Colo.), *appeal dismissed,* 459 U.S. 803, 103 S.Ct. 25, 74 L.Ed.2d 41 (1982); *State v. Garfole,* 76 N.J. 445, 388 A.2d 587 (1978). In such cases the only issue arising under Rule 404(b) is whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense.

*United States v. Aboumoussallem,* 726 F.2d 906, 911–12 (2d Cir.1984) (footnote omitted); *see also United States v. David,* 940 F.2d 722, 736 (1st Cir.1991) (referring to the co-defendants' attempt to exclude another defendant's prior crimes: "Objections based on Rule 404(b) may be raised only by the person whose 'other crimes, wrongs, or acts' are attempted to be revealed."), *cert. denied,* 504 U.S. 955, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992); *United States v. Stevens,* 935 F.2d 1380,

1404 (3d Cir.1991) (" 'It is well established that a defendant may use similar "other crimes" evidence defensively if in reason it tends, alone or with other evidence, to negate his guilt of the crime charged against him.' " (quoting *State v. Williams*, 214 N.J.Super. 12, 20, 518 A.2d 234, 238 (App.Div. 1986))); *United States v. Diaz*, 878 F.2d 608, 616 (2d Cir.) ("In [a] conspiracy case, evidence of crimes, wrongs or acts by coconspirators is admissible and such proof ordinarily does not raise any Rule 404(b) question." (citation omitted)), *cert. denied*, 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989); *United States v. Norton*, 867 F.2d 1354, 1360–61 (11th Cir.) ("Rule 404(b) deals only with acts committed by the defendant himself, not with crimes committed by other members of the conspiracy. The purpose of the rule is to prevent the jury from considering evidence that the *defendant* has, at other times, committed bad acts to convict him of the charged offense." (citations omitted)), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989); *United States v. Gonzalez–Sanchez*, 825 F.2d 572, 583 (1st Cir.) ("Rule 404(b) does not exclude evidence of prior crimes of persons other than the defendant."), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); *United States v. Sepulveda*, 710 F.2d 188, 189 (5th Cir.1983) (noting that admission of evidence pursuant to FRE 404(b) deals only with acts by the defendant individually); *United States v. Morano*, 697 F.2d 923, 926 (11th Cir.1983) ("Rule 404(b) does not specifically apply to exclude this evidence because it involves an extraneous offense committed by someone other than the defendant. The evidence was not introduced 'to show that the defendant has a criminal disposition and that he can be expected to act in conformity therewith,' so the policies underlying Rule 404(b) are inapplicable.");[4] *United States v. Edwards*, 696 F.2d 1277, 1280 (11th Cir.) (noting that FRE 404(b) is not applicable to offenses not

---

4. The Court of Appeals for the Eleventh Circuit later questioned its own reasoning behind limiting FRE 404(b) to crimes, wrongs, and acts committed by a defendant, but acknowledged that they were "bound by it as precedent." *United States v. Sellers*, 906 F.2d 597, 604 n. 11 (11th Cir.1990).

committed by defendant), *cert. denied,* 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983); *United States v. Krezdorn,* 639 F.2d 1327, 1333 (5th Cir.1981) ("When ... the extrinsic offense was not committed by the defendant, the evidence will not tend to show that the defendant has a criminal disposition and that he can be expected to act in conformity therewith. When the evidence will not impugn the defendant's character, the policies underlying Rule 404(b) are inapplicable. It would seem, therefore, that when extrinsic offense evidence is sought to be introduced ... in order to trigger the application of Rule 404(b) there must be an allegation that the extrinsic offense was committed by the defendant."); *United States v. Bates,* 600 F.2d 505, 509 (5th Cir.1979) (noting that FRE 404(b) does not apply to acts and backgrounds of co-conspirators because they are not evidence of crimes committed by the defendant individually); *United States v. Kelley,* 545 F.2d 619, 623 (8th Cir.1976) (explaining that FRE 404(b) applies only to evidence concerning other crimes, wrongs, or bad acts of an accused in a criminal proceeding), *cert. denied,* 430 U.S. 933, 97 S.Ct. 1555, 51 L.Ed.2d 777 (1977).[5]

Several states have made similar interpretations of their other crimes evidence statutes. *Flowers,* 644 P.2d at 919 ("[T]he test for admissibility of similar offense evidence introduced by the defendant ... must [be] decide[d] ... on a case-by-case basis."); *People v. Bueno,* 626 P.2d 1167, 1170 (Colo. Ct.App.1981) ("[W]hen offered by the defendant, evidence of similar transactions is admissible as long as it is relevant to the guilt or innocence of the accused."); *Commonwealth v. Jewett,* 392 Mass. 558, 563, 467 N.E.2d 155, 158 (1984) ("When a defendant offers exculpatory evidence ... prejudice ceases to be a factor, and relevance should function as the admissibility standard."); *Garfole,* 76 N.J. at 452–53, 388 A.2d at 591 ("[W]hen the defendant is offering [other crimes evidence]

---

**5.** Only the Ninth Circuit has expressed the minority view, which broadens FRE 404(b) in criminal proceedings to exclude evidence of crimes, wrongs, and acts committed by witnesses. *United States v. McCourt,* 925 F.2d 1229 (9th Cir.), *cert. denied,* 502 U.S. 837, 112 S.Ct. 121, 116 L.Ed.2d 89 (1991).

exculpatorily, prejudice to the defendant is no longer a factor, and simple relevance to guilt or innocence should suffice as the standard of admissibility, since ordinarily ... an accused is entitled to advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made."); *State v. Dreher,* 302 N.J.Super. 408, 456–57, 695 A.2d 672, 695 (App.Div.) (" '[O]ther crimes' evidence about a State's witness is often admitted when offered by criminal defendants for exculpatory reasons."), *cert. denied,* 152 N.J. 10, 702 A.2d 349 (1997); *Williams,* 214 N.J.Super. at 20, 518 A.2d at 238 ("It is well established that a defendant may use similar 'other crimes' evidence defensively if in reason it tends, alone or with other evidence, to negate his guilt of the crime charged against him.").

The majority rule for the interpretation of FRE 404(b) and of individual states other crimes evidence statutes, is that when evidence of other crimes, wrongs, or acts committed by a third party is proffered by the defendant, the risks of prejudice against the defendant normally are not present. Thus, such evidence does not fall under the exclusionary provision of Rule 404(b). We hold that the same interpretation shall be given to Maryland Rule 5–404(b).

Evidence that Mr. Pitman was robbed by Kelly Dillon within hours of Tracy Dillon's alleged rape and petitioner's beating may have been relevant to petitioner's defense, particularly when coupled with Tracy Dillon's inconsistent statements concerning her brother's identity and petitioner's missing money and lottery tickets. This information was all related to petitioner's defense that he was the victim of a robbery at the hands of Kelly Dillon and that Tracy Dillon had falsely accused him of rape to cover for her brother's involvement in the Pitman robbery and the assault and robbery of petitioner.

Although the evidence petitioner wanted to present did not directly point towards someone else committing the crime, it does provide a theory of the case that attempts to exculpate him. He alleges that he was approached, attacked, rendered

unconscious, and awoke to a charge of rape. His evidence—
(1) that one of the men who assaulted him had committed a
robbery the night of the assault; (2) that this man was the
brother of the alleged rape victim; (3) that the alleged rape
victim lied as to the identity of her brother in an effort to
conceal his criminal activity; and (4) that petitioner was
missing two five dollar bills and two lottery tickets when he
woke up in the hospital—paints a different story than the one
presented by the State. Petitioner was denied an opportunity
to fully present this theory of the case and fully mount a
defense to the accusations against him. The refusal to allow
evidence of Tyrone Pitman's accusation against one of the
State's key witnesses was based on the trial judge's erroneous
interpretation of the law of other crimes evidence. It should
not have been suppressed on other crimes evidence grounds.

### C. Impeachment of Witnesses

Additionally, the heart of petitioner's argument was
that both Tracy and Kelly Dillon lied to conceal criminal
activity committed by Kelly Dillon. Independent of our analy-
sis of other crimes evidence, the evidence of Tracy Dillon's
reaction to Mr. Pitman's statement was admissible on cross-
examination because it was probative of her motive to lie.
Petitioner should also have been allowed to bring in this
evidence in order to impeach the credibility of Dillon. Mary-
land Rule 5–616(b)(3) states:

> Extrinsic evidence of bias, prejudice, interest, or other
> motive to testify falsely may be admitted whether or not the
> witness has been examined about the impeaching fact and
> has failed to admit it.

Under Maryland law, a witness may be impeached by cross-
examination to show that the witness previously made incon-
sistent statements. "To impeach a witness by a prior inconsis-
tent statement, a proper foundation must be laid. When using
a previously made *oral* statement for impeachment, the cross-
examiner must inform the witness of the time and place the
statement was made, the person to whom it was made, and its
substance." *Bane v. State*, 73 Md.App. 135, 155, 533 A.2d 309,

319 (1987) (citations omitted); *see also Hankins v. State,* 80 Md.App. 647, 657, 565 A.2d 686, 691 (1989). Implied in this rule of law is that the facts and circumstances surrounding the inconsistent statements need to be made known to the trier of fact. This is because a trier of fact is not obliged to believe all that it hears, *Phelps v. Goldberg,* 270 Md. 694, 705, 313 A.2d 683, 689 (1974), and is free to believe only a portion of the evidence of each side, *Racine v. Wheeler,* 245 Md. 139, 144, 225 A.2d 444, 447 (1967) (citing *Maryland Chem. Co. v. Monn,* 241 Md. 127, 215 A.2d 731 (1966)). Stated otherwise, it may believe or disbelieve, credit or disregard, any evidence introduced, and a reviewing court may not decide on appeal how much weight must be given to each item of evidence. *Great Coastal Express, Inc. v. Schruefer,* 34 Md.App. 706, 725, 369 A.2d 118, 129 (1977). Without knowledge of the facts surrounding Tracy Dillon's inconsistent statements the trier of fact in the case *sub judice* had no opportunity to assess her credibility.

In *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the United States Supreme Court recognized that

> [c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.... [T]he cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.,* discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness.... A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony."

*Id.* at 316, 94 S.Ct. at 1110, 39 L.Ed.2d 347 (quoting 3A Wigmore, *supra,* § 940, at 775 (Chadbourn rev.1970)). Pursuant to this rationale, petitioner should have been allowed to

introduce the surrounding facts and circumstances concerning Tracy Dillon's inconsistent statements and introduce his theory of the case. The proffered evidence certainly was probative of both Tracy and Kelly Dillon's motive to testify falsely. If petitioner's version of the story was true, clearly Tracy and Kelly Dillon had bias, prejudice, interest, or other motive to testify falsely.

Petitioner's theory of the case is that he was robbed and beaten by Kelly Dillon, and, in an effort to protect her brother, Tracy Dillon fabricated the charge of rape. Considerable weight is added to this defense when Tracy Dillon's inconsistent statements to police about the identity of the men who attacked petitioner are coupled with the proffered evidence that on the same night, in the same general area, Kelly Dillon committed another robbery and Tracy Dillon lied about her brother's identity with respect to that crime. Because the basis of petitioner's defense rests on Tracy and Kelly Dillon's credibility, the trial court erred by excluding evidence of the Pitman robbery that was clearly admissible under Maryland Rule 5–616(b)(3).

### III. Conclusion

We hold that the test for admitting other crimes evidence in criminal proceedings enunciated in *Faulkner* generally does not apply to crimes, wrongs, or acts committed by someone other than a criminal defendant. The other crimes evidence rule is a court-created standard designed to ensure that a defendant is tried for the crime for which he or she is on trial and to prevent a conviction based on reputation or propensity to commit crimes, rather than the facts of the case. Because this rule is premised upon protecting an accused from undue prejudice, it does not apply to exclude other crimes evidence involving alleged actions by others testifying in the criminal proceedings. This is especially so when the evidence is crucial to the defense in a criminal proceeding and concerns impeachment of a witness with a possible prejudice, bias, interest, or motive to falsely testify. Accordingly, we reverse the decision

of the Court of Special Appeals and vacate the judgment of the circuit court.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

RODOWSKY, RAKER, and WILNER, JJ., dissent.

WILNER, Judge, dissenting, in which RODOWSKY and RAKER, JJ., join.

The Court concludes today that the general preclusion against the admission of "other crimes" evidence, called for by Maryland Rule 5–404(b), applies only when such evidence is offered against the defendant in a criminal case. It further concludes, as a corollary to that limitation, that when "other crimes" evidence is offered *by* a defendant to show a propensity on the part of a State's witness for criminal behavior, as an aid in establishing the defendant's defense, it is reversible error to exclude the evidence. The Court then holds that its second precept was violated in this case when the court, in ruling on the State's motion *in limine,* stated that it would not allow a police officer to testify that, while being driven home from the hospital, the victim identified a person on the street as her brother, that a person later identified as Tyrone Pittman then approached the car and complained that the person the victim just identified as her brother had robbed him, and that the victim then hedged on whether the person she had identified was, or was not, her brother.

I have a problem with the underlying legal conclusion reached by the Court—I think that the Court has gone too far in its approach and laid down a rule that is unnecessarily rigid—but the more serious problem is that the issue the Court reaches out to decide is not really in this case. For one

thing, evidence regarding the statements made by the victim *was* admitted into evidence through cross-examination of the victim. The only evidence excluded was the rank hearsay accusation made by Pittman, and that was excluded because it was hearsay, irrelevant, and, on balance, unduly prejudicial to the State. There is no basis, on this record, to reverse the judgment entered by the circuit court.

The State's case was presented largely through the testimony of Tracy and Kelly Dillon. Tracy Dillon, who was about 33 years old at the time of the event, testified that, as she was returning home from the store at around 7:00—7:30 on Christmas Eve, 1996, she was attacked by Sessoms, who, at knifepoint, dragged her into an alley, raped her, allowed her briefly to leave—to go back onto the street—but, when he noticed other people on the street, forced her back into the alley and raped her again. Tracy said that she dropped her scarf and two dollars where the attack occurred. When she was finally released, she ran toward her home and encountered her younger brother, Kelly, and a friend of his. She had blood on her hands and dirt and leaves on her body and in her hair. The injury to her hand occurred, she said, when Sessoms tripped her as she tried to run, and she fell on a piece of glass or metal. Hysterical, she reported what had occurred, and the three went looking for the assailant. When they reached a corner several blocks away, they saw Sessoms coming up the street. Even before Tracy identified him and before anyone accused him of anything, he announced that "I didn't do nothing to her." Tracy said that her assailant had on a certain cologne, the scent of which got on to her during the attack. Kelly smelled Sessoms and Tracy and determined that they exuded the same scent, whereupon he and his friend proceeded to beat Sessoms severely.

The beating was apparently administered in the middle of the street, and eventually the police were summoned. As they were arriving, Kelly and his friend fled. Kelly said they left because they each had outstanding warrants against them. The police thus found Tracy standing beside Sessom's barely conscious or unconscious body. She reported the rape and led

the police to where it had occurred. Her scarf and two one dollar bills were found at that location; the knife was never recovered. Sessoms was arrested and taken to the hospital. Tracy also went to the hospital for examination. Although no traces of semen were found, abrasions on her neck and elbow and lacerations in her anal-genital region consistent with non-consensual sex were observed.

In the course of trial preparation, defense counsel learned that Kelly Dillon had a number of prior robbery convictions, including a conviction for a robbery that occurred on December 26—two days after the alleged attack on Tracy. He also learned that Kelly had been charged with the robbery of Tyrone Pittman that occurred in the early morning hours of Christmas Day—just hours after the attack on Tracy—but that the charge had been nol prossed. In the police report in the Pittman file was a notation by Officer Shipp that, as he was driving Tracy home from the hospital in the early morning hours of Christmas Day, Tracy pointed out a person and identified him as her brother, that Pittman then approached the car and asserted that Kelly had just robbed him, whereupon Tracy equivocated on whether Kelly was her brother.

Counsel apparently intended to call Officer Shipp as a witness and elicit that information from him—the two statements by Tracy and the accusation by Pittman. Counsel suggested at one point that what really occurred that night was that Kelly and his friend had robbed Sessoms and then beat him and that the charge of rape was simply a fabrication. The accusation by Pittman would show that Kelly was a serial robber, that if he robbed Pittman, he probably also robbed Sessoms, and that Tracy's inconsistent statements regarding whether the person she identified was her brother went to her credibility. The State moved *in limine* to exclude that evidence as being both hearsay and irrelevant. The State had no objection to counsel's asking Kelly about his prior convictions for robbery, his asking Tracy about her identification of Kelly and her subsequent equivocation in that identification, or to allowing Sessoms to testify that he was robbed by Kelly, but it asserted that (1) eliciting statements by Tracy or Pittman

through the officer was impermissible as hearsay, and (2) Pittman's complaint about being robbed by Kelly was irrelevant to any issue regarding whether Sessoms raped Tracy, especially as the charge arising from that incident was later nol prossed.

The court agreed with the State. It said that it would allow the defense to bring out any inconsistencies in Tracy's statements and to impeach Kelly with relevant past convictions, but could not see the relevance of the evidence proffered by counsel. Counsel's response was that he wanted to show that Kelly was "a serial robber"—"he basically is a predator in this area, robbing and assaulting people, has a tremendous amount of arrests...." When the court questioned the admissibility of mere arrests, counsel replied that the proffered incident was "in the middle of a pattern of events" and was relevant because it explained why "they would lie about what happened to Mr. Sessoms." The court responded again that it had no concern with questioning Kelly about his record, but "[m]y problem is, the hearsay that comes from the victim [Pittman], he runs up to the car and says that guy just robbed me." Counsel suggested that the statement would constitute an excited utterance, but the court concluded that, even if it were, it would have no relevance and would be more prejudicial than probative.

At the conclusion of the argument on the motion, defense counsel said that, although he had not summoned either Officer Shipp or Mr. Pittman, he wanted the officer as a witness in the event Tracy denied the statements attributed to her in the police report. The prosecutor gave counsel the officer's telephone number, and there appeared to be no impediment to counsel calling the witness for that purpose if he chose to do so. In fact, on cross-examination, Tracy admitted seeing Kelly on the street as Officer Shipp was driving her home and first telling Officer Shipp that Kelly was her brother and then adding "I ain't saying it is my brother or isn't my brother." With those admissions, counsel never called Officer Shipp to testify. The only evidence that was not

actually admitted, therefore, was the accusation by Pittman that Kelly had robbed him.[1]

In his brief in this Court, Sessoms urges that he proffered below that *he* "was the victim of a robbery perpetrated by Kelly Dillon, that Tracy Dillon concocted an allegation of rape to obscure her brother's crime," and that "[i]n support of *this* defense, counsel proffered relevant corroborative evidence of Tracy Dillon's reaction to the report of a separate robbery committed by Kelly Dillon which occurred in the same general area and several hours after Petitioner was beaten." (Emphasis added). It is this contention—that Sessoms himself was robbed by Kelly—that the Court seizes on to find Pittman's hearsay allegation relevant and admissible. The Court states that "[t]his information was all related to petitioner's defense that he was a victim of robbery at the hands of Kelly Dillon and that Tracy Dillon had falsely accused him of rape to cover for her brother's involvement in the robbery and assault on petitioner and the robbery of Pittman."

The problem is that that was not really the nature of Sessoms's defense; the suggestion that Sessoms was robbed by Kelly Dillon was almost an afterthought. The thrust of counsel's argument on the motion *in limine* was that Pittman's accusation would help establish Kelly's predatory nature, which, in turn, would explain why Sessoms was *beaten*. The argument was that Kelly beat Sessoms not because of any rape but because Kelly was a predator. Counsel argued: "in this situation, they have to explain to the police officer, why this man is lying unconscious in the street." The only reference, in the 24 pages of transcript of the argument on the motion, to Sessoms's being robbed was the one passing statement of counsel, near the end of the debate:

---

1. The court made clear, in ruling on the motion *in limine* that, while it had no objection to the questioning of Tracy, "I'm going to deny any opportunity to question as to a third party"—that "I don't want this third party testimony." I take that statement as a final ruling on the matter, thus rendering it unnecessary for counsel to have proffered the evidence at trial. *See Prout v. State,* 311 Md. 348, 535 A.2d 445 (1988) and *compare Reed v. State,* 353 Md. 628, 728 A.2d 195 (1999).

"It's relevant to Defense contention that what really is happening is these people that is Mr. Dillon and his friend are in this area ... robbing people and they robbed him, Mr. Sessoms and others. And not only that, but it goes to their whole credibility in terms of, again, motive and bias. They flee, but they later come back after the police is clear and continue to rob people."

At no point in counsel's opening statement to the jury did he suggest that Sessoms was robbed by Kelly Dillon. His focus, rather, was on the assault. He told the jury:

"What happened to Mr. Sessoms, that we absolutely know about, is that he was left unconscious in the street, after being violently assaulted by two people who fled the scene, that he was taken to the hospital and treated, and he ultimately was taken from the hospital straight to jail to await trial for this case, charged with rape."

At no point in his very brief direct examination did Sessoms contend that he was robbed. He admitted that he was intoxicated on the night in question. He said that, as he was proceeding down the street after having purchased two lottery tickets and a bottle of vodka, he encountered two men and a woman, that the woman told her companions that he, Sessoms, had robbed (not raped) her, that he denied the accusation but was then beaten unconscious by the two men. His next recollection was waking up in the hospital. That was the extent of his direct examination testimony.

The suggestion that Sessoms may have been robbed arose during cross-examination when he was asked what happened to the two lottery tickets he had purchased. He said that, when he awoke in the hospital, his girlfriend, who never testified, came to visit, that he wanted to give her the things in his pocket, that the police had put his clothes in a plastic bag in his hospital room but the officer standing guard unshackled him and allowed him to retrieve his pants and go through the pockets, and that the lottery tickets and two five dollar bills were missing. Twice he said, directly, that he did not know

what happened to the lottery tickets.[2]  The prospect that the lottery tickets and the $10 were taken by Kelly Dillon or his friend was one of pure speculation.  When asked, on cross-examination, whether the people that beat him took anything, Sessoms said, "I'm assuming, the officers said they didn't take it, I'm assuming they didn't;  people whoever beat me up had to take it."  Later, when asked whether the men who beat him went into his pocket and took anything, he replied, "I don't know.  As far as I know, they must had did it while I was unconscious."  On the heels of that assumption, Sessoms was asked on redirect examination, "So it's also, sir, your assertion, that these people not only beat you, but they also robbed you;  it that what your assertion is," to which Sessoms replied, "That's what I'm saying."

That one statement, on redirect examination, buttressed only by the surmise and speculation noted, is the sum and substance of what the Court now concludes was the essence of Sessoms's defense.  It holds that not allowing Officer Shipp to testify about the unsubstantiated hearsay accusation made by Mr. Pittman—an accusation that led to a charge that was later nol prossed—somehow crippled Sessoms's defense.

I agree that the strong policy this Court has adopted against the use of "other crimes" evidence, except as filtered through a *State v. Faulkner* analysis, should ordinarily be limited to the use of that evidence against a defendant in a criminal case.  As the Court correctly points out, it is the perceived trustworthiness of that evidence that makes it so particularly dangerous when offered against the defendant— the fear that the jury may convict for reasons other than a belief beyond a reasonable doubt that the defendant committed the crime for which he or she is standing trial.  It is in that setting that the policy confirmed by us in *Harris v. State,*

---

**2.**  At transcript, p.25, he was asked, "So you don't know what happened to this lottery ticket, is that correct, sir," to which he replied, "No, I do not."  At transcript p.43, he was asked again, "And you don't know what happened to those things," to which he replied, "No, I do not.  I know before I went unconscious, I had it;  when I woke up in the hospital the next day, they were gone."

324 Md. 490, 597 A.2d 956 (1991), of generally *excluding* such evidence, subject to limited *inclusionary* exceptions, rather than *including* such evidence subject to *exclusionary* exceptions, has particular meaning.

That does not mean, however, that "other crimes" evidence, when used solely to imply propensity, should be freely admissible in all other circumstances. The provision in Maryland Rule 5–404(b) that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith, is merely an application of the more general principle stated in § (a) of the Rule. Rule 5–404(a) provides, generally, that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Section (a) then states three exceptions, one dealing with the character of an accused, one with the character of a victim, and one with the character of a witness. We are not concerned here with the character of the accused. The Rule allows evidence of a "pertinent trait of character of the victim of a crime offered by an accused" and evidence of the character of a witness with regard to credibility, as provided in Rules 5–607, 5–608, and 5–609. None of those exceptions apply in this case. Sessoms has not identified any "pertinent trait of character" of Tracy Dillon to which Pittman's accusation was relevant; nor would such evidence fall within Rules 5–608 (character of witness for truthfulness or untruthfulness) or Rule 5–609 (prior conviction of crime).

The only possible basis for Pittman's hearsay statement, to show propensity for violence or robbery on the part of Kelly Dillon would be as an attack on his credibility, allowed by Rule 5–607. As noted, however, Dillon's past criminal record was fully exposed to the jury. He admitted to being convicted of armed robbery in 1997, of robbery committed the day after the alleged rape of Tracy, and of robbery committed in 1988. What Pittman's unsubstantiated hearsay accusation would have added to this attack on Kelly's credibility is a mystery to me. Rule 5–403, which sits atop nearly all rules of admissibility, provides that even relevant evidence may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice or by considerations of needless presentation of cumulative evidence. The trial judge determined that Pittman's accusation was irrelevant and, to the extent it had any probative value, that value was outweighed by undue prejudice to the State. That is quintessentially a judgment call, to which great deference is due, and, on the state of this record, I cannot see how that call represented an abuse of discretion or legal error of any kind. For these reasons, I dissent. I would, at the very least, dismiss the writ of *certiorari* as improvidently granted.

Judges RODOWSKY and RAKER have authorized me to state that they join in this dissent.